REDMOND *vs.* ELY.

*In the matter of the estate of* SAMUEL REDMOND, *deceased.*

If executors distribute assets, in kind, among the legatees, guaranteeing their collection, and subsequently proceed to a final settlement of their accounts and a distribution of the remainder of the estate, resort must be had, in case of loss, to their individual guaranty, after a decree has been entered on the final accounting.

Service of citation *viis et modis*, i. e., by publication in the case of a non-resident, is a constructive service that concludes the party but not the court, and on sufficient grounds the decree may be opened, to obtain substantial justice.

A decree on final accounting will not be opened, unless upon proof that no *laches* was committed, and on such a statement of the alleged error as shall indicate the nature and sufficiency of the grounds for appealing to the equity of the court.

P. T. WOODBURY, *for Petitioner,*
D. D. LORD, *for Executors.*

THE SURROGATE. This is an application by Alexander Redmond, a legatee, to open the decree on the final accounting of the executors, entered July 25, 1848.

In November, 1846, the petitioner received, on account of his share of the estate, four notes of Herman Morris for $1,200 each, at 6, 9, 12, and 15 months from November 1, 1846. Morris had purchased part of the assets, and was indebted to the estate upwards of seven thousand dollars. The allegation is, that the notes were taken on the assurance of Mr. Selden, one of the executors, that Morris was perfectly responsible, and if the notes were not paid "when they fell due, the executors would take them back." Samuel R. Forman states that in *the summer of* 1846, at an interview between Selden, Redmond and himself, Mr. Selden told him privately and apart from Redmond, that if

the latter would take certain notes made by Morris, the executors would receive them back if they were not met at maturity. He says that no agreement was made while he was present, but he communicated Mr. Selden's offer to Redmond, after leaving the office. Among the vouchers is Redmond's receipt dated July 6, 1846, for Morris's note at 90 days for $450; and Mr. Ely one of the executors, states that notes of Morris to the amount of $900 were taken by Redmond in the summer of 1846. Mr. Forman's statement may relate to this transaction, and not to the arrangement in November following. Mr. Selden being in Europe, his explanation has not been laid before me. In any event, Forman expressly says that no agreement was made at the time of which he speaks, and there is no other evidence in the case except the affidavits of Mr. Redmond, the applicant, and of Mr. Ely, the executor.

Mr. Redmond states that *soon after* the interview between himself, Forman and Selden, at the office of the latter in *the summer of* 1846, he called on Mr. Selden, stated what had been communicated by Forman, and Mr. Selden confirming Forman's statement, he consented on these terms to take Morris's notes for $5,000; that the first two of the notes were paid, and the last two were not, whereupon he forthwith called upon Mr. Selden and requested him to take the notes back, which Mr. Selden refused, and directed him to do what he thought best with them. He afterwards received partial payments from Morris, and, March 1, 1849, renewed the notes. Morris died in the summer of 1849, insolvent, and his executors paid a dividend on the claim, leaving $1,430.18 still due, exclusive of some arrears of interest. Redmond alleges also that he had no notice in fact of the final accounting and was not aware a decree had been entered until January last.

Mr. Ely on the other hand states, that in 1846 he was residing in Ohio, and Alexander Redmond and Mrs. Lucretia Redmond, the principal legatees, being anxious to have a final settlement of the estate, he came on to New

York for that purpose, and an agreement was effected principally through his negotiation, by which Mrs. Redmond was to take property of the estate at a certain sum, and Mr. Redmond to accept notes of Morris for $5,000; that the time the notes were to run was entirely arranged between Redmond and Morris, and they were drawn and delivered by Morris directly to Redmond, without the intervention of the executors; that when the last two notes fell due he accompanied Redmond to Mr. Selden's office, where Redmond asked Mr. Selden to take back the notes; that he did not pretend an agreement to that effect; and that Mr. Selden " expressly refused to take said notes, stating that the sole object of having him take them was to carry out an arrangement to wind up the estate." That the notes were received in accordance with a plan to settle the estate, is apparent from the whole transaction; and, indeed, Mr. Redmond himself says the executors urged him to take the notes, as " that by so doing the estate would be readily and more easily closed." There was nothing singular in such an arrangement, for I find on examining the vouchers, that Redmond had been in the habit, as far back as March, 1841, of receiving various sums on account of his share, by the hands of Morris. In August and December, 1845, he took the executors' drafts on Morris for $1,500, and in July, 1846, he received the note of Morris for $450 at three months.

Mr. Ely expressly denies any knowledge of the alleged agreement to take the notes back if they were not paid; and, as the object was to wind up the estate, and have a final distribution, such an understanding would have been inconsistent with that design. In this view of the case, I do not regard such a transaction so much in the nature of a payment, as a distribution of assets in kind; and if on such a distribution the executors have made themselves personally liable by an individual guaranty, resort should be had to that guaranty, when the accounts have been finally closed, and when the legatee has been dealing with

12

the property so taken by him, for several years, as if it were his own, without attempting to stop the distribution of the remaining assets to the other party in interest. The notes fell due four years ago, and so far as the estate or the executors are concerned, this is the first step taken by Mr. Redmond for the enforcement of his supposed rights. Besides, Mr. Ely testifies that Redmond " was fully informed " by him, " of the proceedings of the executors to render their accounting in July, 1848 ; " that he came to New York "with counsel, and examined the account proposed to be rendered and made inquiries of the deponent as to items thereof, and never stated, or expressed or signified to the deponent any objection to the same." Redmond resided in New Jersey, and the citation for final accounting was published in the state paper once a week for three months; and the allegation of Redmond that he had no notice in fact of the proceedings, is contradicted by one of the executors. The service of a citation *viis et modis*, as it is termed, is a constructive service that concludes the party, but not the court, and on good and sufficient grounds the proceedings may be opened to get at the substantial justice of the case (3 *Phill.*, 512). To rescind the conclusion of a cause before or after sentence in order to fresh matter being pleaded, requires proof that no *laches* was committed, and that the measure prayed is one essential to the ends of justice. The application is one addressed to the equity of the Court, and will not be granted without very special reasons, and such a statement of the alleged error as shall indicate the nature and sufficiency of the grounds. (2 *Add.*, 267. 1 *Hagg.*, 88. 2 *Curt.*, 630. 3 *Ibid.*, 119.) The decree in the present instance was pronounced in July, 1848 : it was a final decree settling the rights of other parties interested in the estate, and after such a lapse of time I should be disinclined to disturb it unless upon a very strong case. I am not satisfied that injustice has been done, and the application must therefore be denied.